[Cite as *State v. Edwards*, 2022-Ohio-2384.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|                        |   |                          |
|------------------------|---|--------------------------|
| STATE OF OHIO,         | : |                          |
| Appellant,             | : | CASE NO. CA2022-02-005   |
|                        | : | O P I N I O N            |
| - vs -                 |   | 7/11/2022                |
|                        | : |                          |
| JESSE W. EDWARDS,      | : |                          |
| Appellee.              | : |                          |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 21 CR 38186

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellant.

Smith, Meier & Webb, LPA, and Chase T. Kirby, for appellee.

**S. POWELL, J.**

{¶ 1} Appellant, the state of Ohio, appeals the decision of the Warren County Court of Common Pleas granting the motion to suppress contraband found both inside and outside of a vehicle that appellee, Jesse W. Edwards, was seen driving while he was under

a license suspension. For the reasons outlined below, we reverse the trial court's decision granting Edwards' motion to suppress in its entirety and remand this matter to the trial court for further proceedings.

**Indictment and Edwards' Motion to Suppress**

{¶ 2} On July 19, 2021, a Warren County Grand Jury returned an indictment charging Edwards with single counts of third-degree felony aggravated possession of methamphetamine, first-degree misdemeanor driving under suspension, and fourth-degree misdemeanor possession of drug paraphernalia. The charges arose after Edwards was seen by Franklin Police Officer Patrick Holland driving a red Chevy Monte Carlo near the intersection of William C. Good Boulevard and State Route 123 in Franklin, Warren County, Ohio on the evening of June 10, 2021. At the time, Officer Holland recognized Edwards whom he knew to be under a license suspension. Edwards was thereafter stopped by Officer Holland walking through a nearby Waffle House parking lot and subsequently found to be in possession of methamphetamine and other drug paraphernalia located both inside and outside the Monte Carlo he had been driving. Edwards pled not guilty to the charges and was subsequently released from jail on his own recognizance on August 19, 2021.

{¶ 3} On November 9, 2019, Edwards filed a motion to suppress the contraband underlying the aggravated possession of methamphetamine and possession of drug paraphernalia charges. To support his motion, Edwards alleged the following facts:

> In this case, law enforcement observed Mr. Edwards exit his vehicle and walk toward Waffle House located in Franklin, Ohio.[1] No traffic stop had been initiated. Law enforcement

---

1. We note that although Edwards referred to the vehicle he was driving as "his vehicle" in his motion, the record indicates the vehicle was registered to Edwards' mother, not Edwards. The record also indicates that Edwards' mother allowed Edwards to drive the vehicle on the evening in question, June 10, 2021. Edwards, therefore, had a legitimate expectation of privacy in the vehicle. *See State v. Rideau*, 2d Dist. Montgomery No. 17002, 1999 Ohio App. LEXIS 577, *8 (Feb. 26, 1999) (the owner of a vehicle or one validly in possession of another's vehicle has a legitimate expectation of privacy in the vehicle). We find this holds true even though Edwards was driving the vehicle with a suspended license. *See United States v. Jones*, 438 F.Supp. 1039,

believed Mr. Edwards had an active arrest warrant and was driving under suspension. Law enforcement told Mr. Edwards to stop. Mr. Edwards was placed in handcuffs and secured in the back of the patrol car. Law enforcement proceeded to search Mr. Edwards' vehicle without a warrant. Law enforcement then allegedly discovered contraband in the vehicle. Next, law enforcement had a mere hunch that Mr. Edwards had "potentially discarded" contraband upon exiting the vehicle. Law enforcement then allegedly discovered more contraband in the grass approximately five to ten yards away from the vehicle Mr. Edwards was driving.

{¶ 4} Based on these facts, Edwards argued the contraband seized because of the "search" of the vehicle's interior was an unconstitutional, warrantless search that violated his Fourth Amendment rights to be free from unreasonable searches and seizures. Edwards also argued the contraband seized during of the "search" of the grassy area in the area outside the vehicle should likewise be suppressed because it was "derivative" evidence that was only discovered because of the "illegal search" conducted inside the vehicle.

**Hearing on Edwards' Motion to Suppress**

{¶ 5} On January 25, 2022, the trial court held a hearing on Edwards' motion to suppress. During this hearing, the trial court heard testimony from one witness: Officer Holland. The following is a summary of Officer Holland's testimony presented at that hearing.

*Officer Holland's Suppression Hearing Testimony*

{¶ 6} At approximately 9:37 p.m. on the evening of June 10, 2021, Officer Holland

---

1060 (N.D.Cal.2020) ("notwithstanding his suspended license, under all of the circumstances, Jones had a reasonable expectation of privacy in the car that he was driving when the officers conducted the stop and search"); *see also United States v. Walton*, 763 F.3d 655, 666 (7th Cir.2014) ("[w]e conclude that Walton's lack of a valid driver's license did not categorically deprive him of either a subjective or objectively reasonable expectation of privacy in the rental car").

was on duty training a newly hired police officer, Officer Davis.[2]  At that time, Officer Holland was driving his marked patrol car near the intersection of William C. Good Boulevard and State Route 123 in Franklin, Warren County, Ohio.  While passing through that intersection, Officer Holland saw Edwards driving a red Monte Carlo in the opposite direction on State Route 123.  Officer Holland recognized Edwards as the driver because of "several run-ins with Mr. Edwards through [his] almost 11 years at the City of Franklin."  Officer Holland also knew Edwards "was under several active suspensions" because he had "just previously ran [Edwards] through [his in-car] computer system earlier that week * * *."  Officer Holland further testified that he had "just had an encounter with [Edwards] a few weeks prior" where he "issued [Edwards] a driving under suspension" because Edwards "was under multiple suspensions."

{¶ 7}  Upon seeing Edwards driving that evening, Officer Holland made a U-turn back towards the intersection of William C. Good Boulevard and State Route 123.  After making that U-turn, Officer Holland noticed Edwards appear to "accelerate rapidly" just prior to him turning into a nearby Waffle House parking lot.  Officer Holland then watched as Edwards parked the Monte Carlo in the parking space closest to the exit onto State Route 123 "maybe five or six parking stalls to the east of the front doors of Waffle House."  Officer Holland then saw Edwards exit the vehicle and begin nervously walking towards the Waffle House entrance in such a manner that, based on Officer Holland's training and experience, gave Officer Holland the impression that Edwards might "take off," "turn around," and "run." This included Edwards "looking around," possibly gauging where the "best avenues" were for Edwards to "escape."

---

2. The record indicates that on the evening of June 10, 2021, Officer Davis was still early in her training as an officer with the city of Franklin.  Officer Holland, therefore, was assigned to be with Officer Davis to ensure that she was handling her assigned duties correctly.

{¶ 8} Officer Holland followed Edwards into the Waffle House parking lot. Officer Holland testified that upon driving his patrol car into the Waffle House parking lot Edwards was "in the middle of the parking lot between the two parking lanes" attempting to "distance himself from the vehicle." Officer Holland then stopped his patrol car, exited the vehicle, and told Edwards "not to do it because he appeared like he was going to run." Officer Holland then told Edwards to walk back over towards him and Officer Davis. The record indicates Edwards complied with Officer Holland's directive. Officer Holland then told Edwards that he was going to search his person for weapons, "to which [Edwards] didn't object."

{¶ 9} Following the search of Edwards' person, Officer Holland placed Edwards under arrest for driving under suspension. Officer Holland then put Edwards in handcuffs and secured Edwards in the back of his patrol car. Explaining why he did this, Officer Holland testified:

> I detained [Edwards] in the rear of my patrol car because once I initiated the traffic stop, his body language was pretty common with someone who flees on foot. And I didn't want him to run or pose a threat to himself or myself by having to get into an altercation with him. So I did place him in handcuffs and secured him in the back of my patrol car.

{¶ 10} After placing Edwards under arrest, and once Edwards was secured in the back of his patrol car, Officer Holland exercised his discretion to have the Monte Carlo towed out of the Waffle House parking lot. Officer Holland testified this decision was made per the terms of the Franklin Police Division's policy regarding when a vehicle could, or should, be towed. This is because, as Officer Holland testified, "[s]ometimes we can make other arrangements and sometimes we tow the vehicle." Officer Holland later testified that he decided to have the vehicle towed per the towing policy given Edwards' status as a "habitual driving offender" who he had "multiple dealings with" because it was his belief that

Edwards' mother "allows" him to drive the Monte Carlo despite her knowing Edwards does not have a valid driver's license.

{¶ 11} Officer Holland testified the Franklin Police Division's towing policy requires all vehicles being towed to undergo an "inventory search." Officer Holland testified this type of search is necessary so that "we know what's in there so they can't claim that we stole something or something is missing out of there. That way we have a log of what's in there." After deciding to have the vehicle towed, Officer Holland told Edwards that he was going to conduct a "search" of the vehicle. Officer Holland and Officer Davis then proceeded over to where the Monte Carlo was parked in the Waffle House parking lot. Once there, Officer Holland testified that he saw in "clear," "plain view," "in the open," near the vehicle's "center console" and gear shifter a small piece of methamphetamine, "[a]lmost like a small chard of meth."[3] Officer Holland testified that two clear plastic baggies containing methamphetamine were also found outside "directly in front" of the Monte Carlo sitting in plain view approximately five to ten feet away from the vehicle "in the grassy area separating the parking lot of Waffle House and State Route 123."

*The Trial Court's Findings Made at the Suppression Hearing*

{¶ 12} Once both Edwards and the state rested, the trial court heard closing arguments from both parties. Following these arguments, the trial court made several statements on the record noting its initial factual findings. This included the trial court finding the methamphetamine seized from inside the vehicle "was in plain view" and that Officer Holland "had a right to search the vehicle." The trial court found this to be the case "since [the methamphetamine] was in plain view, it was pretty apparent that [Officer Holland] was going to see [the methamphetamine] anyway" even without conducting an inventory search

---

3. The record indicates Officer Holland also found a digital scale inside the vehicle either on top of or directly underneath the vehicle's front passenger seat.

- 6 -

of the Monte Carlo prior to having the vehicle towed out of the Waffle House parking lot.

**The Trial Court's Decision on Edwards' Motion to Suppress**

{¶ 13} On February 9, 2022, and despite the trial court's initial findings set forth above, the trial court issued a decision granting Edwards' motion to suppress the contraband found both inside *and* outside the vehicle Edwards had been seen driving. In so holding, the trial court stated the issue to be decided was whether the vehicle Edwards was driving "was lawfully impounded or whether the impoundment was merely a pretext for an evidentiary search of the impounded car." The trial court then determined that, based on Officer Holland's testimony, and when considering it was within "the discretion of the officer on the scene to determine whether a vehicle will be towed or impounded or whether other alternative arrangements may be permitted for the vehicle," Edwards vehicle was not lawfully impounded.[4]

{¶ 14} The trial court then determined that, even when assuming the vehicle was lawfully impounded, Officer Holland's testimony "undermines the premise that the vehicle was impounded and searched without a warrant for reasons divorced from a criminal investigation." The trial court instead found Officer Holland's testimony "was indicative of a pretextual search" of the vehicle. Explaining its reasoning, the trial court stated:

> Officer Holland did not consider the location of the vehicle and the potential hazard or inconvenience it posed to the public or even the owner of the Waffle House. Officer Holland's decision [to have the vehicle towed] was made based solely on his prior dealings with [Edwards] and his evidence[d] displeasure with the fact [Edwards'] mother allowed him to drive a vehicle with a suspended license. The Court finds Officer Holland was looking for evidence to use against [Edwards] during the inventory search rather than for valuables to safeguard.

---

4. When making that finding, the trial court cited R.C. 4513.61(A). Pursuant to that statute, a law enforcement officer may order into storage any vehicle that: (1) has come into their possession because of the performance of their law-enforcement duties; or (2) has been left on a public street, property open to the public, or the right-of-way of any road or highway for 48 hours or longer without law enforcement receiving notice of the reasons the vehicle was left. *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, ¶ 24. The statute also authorizes the immediate impoundment of vehicles that are obstructing traffic. *Id.*

{¶ 15} The trial court then set forth the "remedy" that should be afforded to Edwards' given this supposed violation of his Fourth Amendment rights. Specifically, the trial court stated:

> The search of the vehicle in this case was not objectively reasonable under the Fourth amendment. It was not a reasonable search incident to arrest or a lawful impoundment. [Officer Holland] testified that [Edwards] was outside the vehicle by the time the officer arrived on the scene and [Edwards] was immediately taken into custody for driving under suspension. Officer Holland's decision to impound and search the vehicle was based solely on his discretion, and he made that choice not based upon the crime for which he was arresting [Edwards] or the location of the vehicle in relation to the safety of the public, but because he knew [Edwards], had prior criminal dealings with [Edwards], and desired to search the vehicle for evidence of further crimes.

{¶ 16} Continuing, the trial court stated:

> The fact [that] any person may be arrested in Franklin, Ohio and may be permitted to have his or her vehicle retrieved by a friend or relative rather than impounded based solely on the mood or whim of the arresting officer is precisely the type of governmental intrusion the Fourth Amendment seeks to prohibit. Permitting the evidence seized in and around the [vehicle] under the good-faith exception to the exclusionary rule would eviscerate the purpose of the Fourth Amendment's prohibition against unreasonable searches and seizures. Thus, the evidence must be excluded [as fruit of the poisonous tree].

(Internal quotations and citations deleted.)

**The State's Appeal and Single Assignment of Error**

{¶ 17} On February 15, 2022, the state filed a timely notice of appeal from the trial court's decision granting Edwards' motion to suppress. Following this court's request for supplemental briefing, oral argument was held on June 6, 2022. The state's appeal now properly before this court for decision, the state has raised one assignment of error for review. In its single assignment of error, and supplemental brief, the state challenges the trial court's decision to grant Edwards' motion to suppress. We agree with the state and

find multiple reasons why the trial court erred by granting Edwards' motion to suppress the contraband seized from both inside *and* outside the red Chevy Monte Carlo that Edwards was seen driving on the evening of June 10, 2021.

**Motion to Suppress Standard of Review**

{¶ 18} "Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact." *State v. Turner*, 163 Ohio St.3d 421, 2020-Ohio-6773, ¶ 14, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence to resolve factual questions and evaluate witness credibility." *State v. Green*, 12th Dist. Fayette No. CA2021-03-009, 2022-Ohio-101, ¶ 7, citing *State v. Vaughn*, 12th Dist. Fayette No. CA2014-05-012, 2015-Ohio-828, ¶ 8. "Therefore, when reviewing a trial court's decision on a motion to suppress, this court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence." *State v. Stout*, 12th Dist. Butler No. CA2020-08-085, 2021-Ohio-1125, ¶ 11; *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, ¶ 16 ("[a]n appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence"). "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12. This means "the appellate court must decide the legal questions independently, without deference to the trial court's decision." *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, ¶ 14; *State v. Tidwell*, 165 Ohio St.3d 57, 2021-Ohio-2072, ¶ 18 ("[t]he appellate court must decide questions of law de novo, without deference to the lower court's legal conclusions").

- 9 -

**The Fourth Amendment's Protections**

{¶ 19} "The Fourth Amendment protects the individual's actual and justifiable expectation of privacy from the ear and eye of the government." *State v. Buzzard*, 112 Ohio St.3d 451, 2007-Ohio-373, ¶ 13. That is to say, "[t]he Fourth Amendment protects people against unreasonable searches and seizures."[5] *State v. LaRosa*, 165 Ohio St.3d 346, 2021-Ohio-4060, ¶ 16. "'A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.'" *State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals*, 63 Ohio St.3d 354, 364 (1992), quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652 (1984). A person has "no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." (Internal citations deleted.) *Texas v. Brown*, 460 U.S. 730, 740, 103 S.Ct. 1535 (1983). A person also has no legitimate expectation of privacy in the area outside of an automobile parked in a place that is open to the public. *State v. Hoppert*, 181 Ohio App.3d 787, 2009-Ohio-1785, ¶ 19 ("[appellant] had no legitimate expectation of privacy outside of her vehicle because she had parked her car in a public place"). The same is true as it relates to property that a person voluntarily discards and/or abandons. *State v. McMillon*, 7th Dist. Columbiana No. 18 CO 0016, 2019-Ohio-2716, ¶ 19 ("[a] defendant who has voluntarily abandoned property lacks standing to object to the search and seizure of that property"), citing *State v. Freeman*, 64 Ohio St.2d 291, 296 (1980) ("one does not have standing to object to a search and seizure of property that he has voluntarily abandoned").

---

5. Article I, Section 14 of the Ohio Constitution contains almost identical language as the Fourth Amendment to the United States Constitution. *State v. Johnson*, 10th Dist. Franklin No. 21AP-222, 2022-Ohio-1733, ¶ 46. Because of their nearly identical language, the Ohio Supreme Court has interpreted Article I, Section 14 of the Ohio Constitution as affording at least the same protections as the Fourth Amendment. *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234, 238-239 (1997).

**Plain-View Doctrine and the Plain-View Exception**

{¶ 20} The plain-view doctrine, also known as the open-view doctrine, is one of the few well-defined exceptions to the Fourth Amendment's warrant requirement. *State v. Henderson*, 12th Dist. Warren Nos. CA2002-08-075 and CA2002-08-076, 2003-Ohio-1617, ¶ 11, citing *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022 (1971). The plain view doctrine embodies the understanding that, although society generally respects a person's expectations of privacy, the police are free to observe whatever may be seen from a place where they are entitled to be. *Buzzard*, 2007-Ohio-373 at ¶ 15-16, citing *Florida v. Riley*, 488 U.S. 445, 449, 109 S.Ct. 693 (1989); and *Horton v. California*, 496 U.S. 128, 134-137, 140-142, 110 S.Ct. 2301 (1990). This is because the Fourth Amendment's protections against unreasonable searches and seizures does not itself draw the blinds individuals could have drawn for themselves but did not. *State v. Pettiford*, 12th Dist. Fayette No. CA2017-05-010, 2018-Ohio-1015, ¶ 12.

{¶ 21} Because of this, it is now well established that the "mere observation of an object in plain view does not constitute a search" under the Fourth Amendment. *Buzzard* at ¶ 17, citing *United States v. Dunn*, 480 U.S. 294, 305, 107 S.Ct. 1134 (1987); and *United States v. Pace*, 955 F.2d 270, 275-276 (5th Cir.1992). It is also well established that "contraband which comes within the plain view of an officer who is rightfully in a position to make such an observation is subject to seizure and constitutes admissible evidence in a criminal trial." *State v. Reeder*, 12th Dist. Clinton No. CA2002-04-017, 2002-Ohio-6680, ¶ 15, citing *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992 (1968). Therefore, under the plain-view exception, "a law-enforcement officer may seize clearly incriminating evidence when it is discovered in a place where the officer has a right to be." *LaRosa*, 2021-Ohio-4060 at ¶ 33, citing *Washington v. Chrisman*, 455 U.S. 1, 5-6, 102 S.Ct. 812 (1982).

**Exclusionary Rule and the "Fruit of the Poisonous Tree"**

{¶ 22} "The 'exclusionary rule' is a judicially created sanction designed to compel respect for and deter violations of the Fourth Amendment." *State v. Harrison*, Slip Opinion No. 2021-Ohio-4465, ¶ 44; *Davis v. United States*, 564 U.S. 229, 236-237, 131 S.Ct. 2419 (2011) (the "exclusionary rule" is "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation"). "Exclusion is not meant to serve as a remedy for the injury caused by an unconstitutional search or seizure but rather as a deterrent against future violations." *State v. Dibble*, 159 Ohio St.3d 322, 2020-Ohio-546, ¶ 15. The exclusionary rule is "applicable only where its deterrence benefits outweigh its 'substantial social costs.'" *Pennsylvania Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 363, 118 S.Ct. 2014 (1998), quoting *United States v. Leon*, 468 U.S. 897, 907, 104 S.Ct. 3405 (1984). "The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality, or 'fruit of the poisonous tree.'" *State v. Carter*, 69 Ohio St.3d 57, 67 (1994), citing *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266 (1939). Therefore, if the government obtains evidence through actions that violate the Fourth Amendment's prohibition against unreasonable searches and seizures, such evidence must be excluded at trial as the aforementioned "fruit of the poisonous tree." *Black v. Hicks*, 8th Dist. Cuyahoga No. 108958, 2020-Ohio-3976, ¶ 99.

**The Attenuation Doctrine**

{¶ 23} The United States Supreme Court's reluctance to suppress evidence under the exclusionary rule has led to several exceptions involving the causal relationship between the unconstitutional act and the discovery of the evidence at issue. *State v. Lask*, 4th Dist. Adams No. 20CA1117, 2021-Ohio-1888, ¶ 23. One of those exceptions is the "attenuation doctrine." *State v. Wintermeyer*, 10th Dist. Franklin No. 16AP-381, 2017-Ohio-

5521, ¶ 36. The "attenuation doctrine" provides that "evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 579 U.S. 232, 238, 136 S.Ct. 2056 (2016), quoting *Hudson v. Michigan*, 547 U.S. 586, 593, 126 S.Ct. 2159 (2006). That is to say, under the attenuation doctrine, "evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" *Segura v. United States*, 468 U.S. 796, 804-05, 104 S.Ct. 3380, 3385 (1984), quoting *Nardone*, 308 U.S. at 341. The following three factors are "necessary considerations" when applying the attenuation doctrine: (1) the temporal proximity between the unconstitutional conduct and the discovery of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Stout*, 12th Dist. Butler CA2020-08-085, 2021-Ohio-1125, ¶ 19, citing *Strieff* at 239, citing *Brown v. Illinois*, 422 U.S. 590, 603-604, 95 S.Ct. 2254 (1975).

**Analysis**

{¶ 24} As noted above, and as properly outlined by the state in its appellate and supplemental briefs, we find there are multiple reasons why the trial court erred by granting Edwards' motion to suppress in this case. This includes the contraband seized from both inside *and* outside the Monte Carlo that Edwards was seen driving on the evening of June 10, 2021. Those reasons are as follows.

*Contraband Seized from Inside the Vehicle*

{¶ 25} The trial court found the contraband seized from inside the vehicle was the result of an unlawful impoundment by Officers Holland and Davis that was done merely as a "pretext for an evidentiary search" of the vehicle. The trial court's decision, however,

- 13 -

completely overlooks Officer Holland's uncontradicted testimony that upon approaching the vehicle in the Waffle House parking lot, he discovered a piece of methamphetamine sitting out in "clear," "plain view," "in the open," near the vehicle's center console and gear shifter. We find the trial court's ability to overlook this testimony baffling when considering the trial court's findings at the suppression hearing that (1) the methamphetamine seized from inside the vehicle "was in plain view;" and (2) Officer Holland could search the vehicle "since [the methamphetamine] was in plain view, it was pretty apparent that [Officer Holland] was going to see [the methamphetamine] anyway" even without conducting an inventory search of the vehicle.

{¶ 26} But, rather than focusing on what we find to be a clear application of the plain view doctrine, the trial court instead focused its attention on whether Officer Holland's decision to have the Monte Carlo towed out of the Waffle House parking was a "pretext for an evidentiary search" of the vehicle. The trial court found that it was. We can find no evidence in the record to support such a finding. There is, in fact, nothing in the record that even remotely suggests Officer Holland was acting improperly and with some ulterior motive by making the decision to have the vehicle towed rather than let it sit idly by in the Waffle House parking lot. The record instead firmly establishes that both Officers Holland and Davis were acting well within the acceptable bounds set forth by the Franklin towing policy when deciding whether that vehicle could, or should, be towed away from the scene. The fact that Officer Holland gave Edwards the courtesy of knowing he and Officer Davis were going to conduct a "search" of the vehicle prior to it being towed does not change that fact.

{¶ 27} In so holding, we find it necessary to note our finding nothing unreasonable about a police officer exercising his or her discretion to have a vehicle towed out of a restaurant parking lot when the driver of that vehicle cannot legally drive away from the scene, both literally and figuratively, due to the driver having been placed under arrest,

handcuffed, and secured in the back of a patrol car for driving with a suspended license.[6] There is also nothing unreasonable about a police officer exercising his or her discretion to forego contacting the vehicle's rightful owner prior to having a vehicle towed from the scene under these circumstances. This is because police officers, even those employed within the trial court's jurisdiction, do not owe individuals who are placed under arrest for driving under suspension a favor by contacting a friend or a relative to come retrieve the vehicle that they were driving upon being placed under arrest. This includes, as it relates to the facts of this case, the driver's mother.

{¶ 28} To hold otherwise, like the trial court did in this case, places an undue burden on police officers to go out of their way to assist someone who had just moments before been committing a felony driving offense. This is not a right guaranteed to individuals under the Fourth Amendment. *See United States v. Cohen*, M.D.Fla. No. 8:20-cr-134-T-60AEP, 2020 U.S. Dist. LEXIS 195311, *5 ("[a]lthough there may have been other things the officers could have done – such as leaving the vehicle in the parking lot * * * or giving custody of the car to Defendant's cousin who lived at the apartment complex [where the vehicle was parked] – the police were not required to do any of those things"). Nor should it be. The Fourth Amendment protects individuals from unreasonable searches and seizures. That is it. The trial court's decision in this case stretches the Fourth Amendment's protections to the point of snapping. Therefore, because the trial court erred by granting Edwards' motion to suppress as it relates to the contraband seized from inside the vehicle, the state's arguments challenging the trial court's decision to suppress the contraband seized from inside the vehicle are sustained.

*Contraband Seized from Outside the Vehicle*

---

6. We note that the same may not be true had the vehicle in question been legally parked in front of the driver's home or business. But that is not what we have here.

{¶ 29} Just like with the contraband seized from inside the vehicle, the trial court also erred by granting Edwards' motion to suppress the contraband seized from outside the vehicle. There are multiple reasons for this. First, Edwards had no legitimate expectation of privacy in the area surrounding the vehicle. This includes the grassy area between the Waffle House parking lot and State Route 123 where the contraband was located. *See e.g., State v. Cullers*, 2d Dist. Montgomery No. 8781, 1985 Ohio App. LEXIS 5670, *7 (Jan. 4, 1985) ("the recovery of the [clothes] hanger from the parking garage implicates no fourth amendment interests of the appellant. The hanger was recovered next to the victim's van parked in a public place. The appellant has no legitimate expectation of privacy in the parking garage, and he cannot complain of a search made of that area").

{¶ 30} Second, Edwards had no legitimate expectation of privacy regarding the contraband at issue once he purportedly discarded the seized contraband as Officers Holland and Davis approached in a marked patrol car. *See, e.g., State v. MacKlin*, 8th Dist. Cuyahoga No. 57747, 1990 Ohio App. LEXIS 5370, *5-6 (Dec. 6, 1990) ("appellant no longer retained a reasonable expectation of privacy with regard to the two bags of crack-cocaine once [appellant] voluntarily discarded them" by placing them into a mailbox attached to an abandoned house as detectives approached in an unmarked patrol car).

{¶ 31} Third, the contraband was discovered outside and in plain view for the world to see had anyone stopped to look. And fourth, even when assuming Officers Holland and Davis had conducted an unconstitutional inventory search of the vehicle, the connection between the search of the vehicle and the seizure of the contraband located outside that vehicle, if any, was so attenuated as to dissipate any resulting taint therefrom.

{¶ 32} Despite what the trial court found in this case, "it is essential to note that not all evidence that is gathered either prior to or after an unlawful search is necessarily 'fruit of the poisonous tree.'" *United States v. Garcia*, 80 M.J. 379, 389, 2020 CAAF LEXIS 706,

- 16 -

(Dec. 9, 2020), citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407 (1963). "The only *true* poisonous fruit is evidence that was gathered as a *result* of the unlawful search." (Emphasis sic.) *Id.* The contraband located outside the vehicle certainly cannot be classified as "fruit of the poisonous tree" when considering the contraband could just as easily been discovered had the Monte Carlo never been searched at all. To hold otherwise, like the trial court did in this case, would effectively bar police from ever walking around areas near where an individual was legally stopped and placed under arrest. Again, the Fourth Amendment's protections against unreasonable searches and seizures cannot stretch that far without snapping. Therefore, because the trial court erred by granting Edwards' motion to suppress as it relates to the contraband seized from outside the vehicle as well, the state's arguments challenging the trial court's decision suppressing the contraband seized from outside the vehicle are also sustained.

**Conclusion**

{¶ 33} For the reasons outlined above, we reverse the trial court's decision granting Edwards' motion to suppress the contraband that was located both inside the vehicle *and* outside the vehicle Edwards was seen driving on the evening of June 10, 2021 and remand this matter to the trial court for further proceedings.

{¶ 34} Judgment reversed and remanded.

HENDRICKSON, J., concurs.

PIPER, P.J., concurs separately.


**PIPER, P.J., concurring separately.**

{¶ 35} I concur with the thorough and accurate preceding opinion, except for footnote 1. I only write separately because I find that Edwards failed to demonstrate he had standing to suppress anything found inside his Mother's vehicle for two reasons. First, Edwards

failed to demonstrate he had permission from the vehicle's owner, his Mother, to operate the vehicle on the specific evening when he was stopped, and secondly Edwards was not in lawful possession of the vehicle.

{¶ 36} Merely being an accused or named defendant, or otherwise an individual desirous of preventing the introduction of damaging evidence, does not give that individual standing. *State v. Nicholson*, 5th Dist. Stark No. 2016 CA 00210, 2017-Ohio-2825, ¶ 26. A trial court may review the reasonableness of law enforcement's conduct in a particular circumstance *after* the defendant demonstrates standing to challenge the violation of his or her Fourth Amendment right to privacy. *Id.*

### Failure to Demonstrate Permission

{¶ 37} One who is stopped operating a vehicle titled to another, and who subsequently seeks to suppress evidence found in the vehicle, must demonstrate lawful possession of the vehicle while operating it to establish standing. One who cannot demonstrate lawful possession, in turn, cannot meet the burden of establishing a reasonable and justifiable, subjective expectation of privacy in possessing the vehicle. *State v. Carter,* 69 Ohio St.3d 57, 63 (1994); *Nicholson* at ¶ 22-23. Customarily, this burden is met by the defendant presenting testimony from the vehicle's owner that permission had been granted to the defendant to operate the vehicle at the time he or she was detained. *Id.*; *State v. Hamilton,* 122 Ohio App.3d 259, 262-63 (2nd Dist. 1997). *See also State v. Henderson*, 5th Dist. Ashland No. 07COA031, 2008-Ohio-5007, ¶ 22 (where the defendant did not have standing to challenge the search of a rented vehicle because he could not demonstrate he had permission to be operating the vehicle).

{¶ 38} In the present case, Edwards presented no testimony from the owner of the vehicle, his Mother, that he had her permission to be operating her vehicle. Edwards presented no testimony from any witness to show Edwards had permission on June 10 to

operate his Mother's vehicle. Officer Holland testified he "believed" Edwards' Mother permitted Edwards to routinely drive her car. However, that testimony only represents an unconfirmed suspicion and says nothing about permission being given that particular evening. Without question such testimony falls far short of meeting Edwards' burden to demonstrate he had permission to operate his Mother's vehicle that particular evening.

**Failure To Lawfully Operate Vehicle**

{¶ 39} R.C. 4507.02(B) clearly sets forth that no one under a license suspension can operate a motor vehicle anywhere within the state lawfully. In Ohio, a driver's license is a privilege and not a right. *Doyle v. Ohio BMV*, 51 Ohio St.3d 46 (1990), paragraph two of the syllabus. If a person had an operator's license but the state suspended driving privileges, then that person cannot lawfully operate a motor vehicle. Those who unlawfully operate a motor vehicle knowing their driving privileges have been revoked are aware they can be arrested at any time. Knowing they can be arrested due to their illegal operation of a vehicle, they cannot reasonably expect to be shielded from the events that follow, such as a search incident to arrest or an inventory search. Having no right to privacy while in the course of his or her illegality, a defendant has a high hurdle in establishing a legitimate expectation of privacy in the place searched that society is prepared to recognize as reasonable. *See Nicholson*, 2017-Ohio-2825 at ¶ 22. With driving under suspension, the vehicle is the very instrumentality the offender uses to fulfill the criminal conduct. Unfortunately, drivers operating vehicles while under suspension and in defiance of the law have reached epidemic proportions. Their cases overwhelm municipal courts' dockets throughout the state.[7]

---

7. In 2019, 13 percent of all driver's licenses in the state of Ohio were suspended. Sam Sotul, The Center for Community Solutions, https://www.communitysolutions.com/drivers-license-suspensions-disproportionately-impact-poor-ohioans/ (accessed June 29, 2022). While extensive discussion has taken

{¶ 40} In this particular case, it appears Edwards was a familiar face to the local police department. Officer Holland had repeated contact with Edwards and believed Edwards to be operating the vehicle while possessing no privilege to do so. Officer Holland confirmed his belief with dispatch. Consequently, Edwards was not "validly" in possession, or "lawfully" in possession of a vehicle, and therefore fails in his burden of demonstrating a legitimate expectation of privacy.

### Conclusion

{¶ 41} Edwards was not lawfully in possession of a motor vehicle, and he failed to demonstrate a legitimate expectation of privacy. Edwards therefore lacks standing to challenge the search of his Mother's vehicle. But that limited issue aside, I completely agree with the analysis and judgment of the majority opinion as this matter obviously needs to be reversed for multiple reasons.

---

place regarding the punitive impact of license suspensions, the paramount interest is promoting public safety. *State v. Sanders*, 4th Dist. Athens No. 95 CA 1670, 1995 Ohio App. LEXIS 5852, at *15 (Dec. 21, 1995).